IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TONIA DIXON, | : |
|  | : CIVIL ACTION NO. 08-CV-____ |
| Plaintiff, | : |
| vs. | : |
|  | : |
| NEW CASTLE COUNTY, | : |
|  | : |
| Defendant. | : |

**COMPLAINT - JURY TRIAL DEMANDED**

**I.    INTRODUCTION**

1.     Plaintiff Tonia Dixon brings this action for equitable relief and monetary damages to redress the deprivation of civil rights secured to her by the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 2000e *et seq.*, the Delaware Handicapped Persons in Employment Protections Act ("DHPEPA"), and the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.*, while she was an employee of Defendant.  Specifically, she alleges that she was not provided with a reasonable accommodation and that she was prevented from working, and that the defendant's actions caused her mental distress and humiliation, and loss of employment and compensation.  She seeks back pay, and compensatory damages, liquidated damages, attorneys fees, expenses and costs of this action.

**II.    JURISDICTION**

2.     Jurisdiction of this civil rights action is conferred on this Court by 42 U.S.C. §§ 717(c) and 706, and 28 U.S.C. §§ 1343 and 1331.  The Court's supplemental and pendent party jurisdiction under 28 U.S.C. § 1367 is invoked over Ms. Dixon's claims under the Delaware Handicapped Persons in Employment Protection Act, et seq.

    3.    Venue herein is proper under 28 U.S.C. § 1391(b) and (c), and 42 U.S.C. § 2000e-5(f)(3) as the acts complained of herein all occurred within this judicial district.

### III.  PARTIES

    4.    Plaintiff Tonia Dixon is a citizen of the U.S. currently residing in New Castle, DE and is subject to the jurisdiction of this court.

    5.    Defendant New Castle County is now, and was at all relevant times, a municipality organized under the laws of the State of Delaware and conducting business at 3601 N. DuPont Highway, New Castle, DE.  At all relevant times Defendant has had at least 15 employees and is capable of being sued under the ADA and the DHPEPA and is subject to the jurisdiction of this court under those statutes.  Defendant also had 50 or more employees at the location where plaintiff worked at all relevant times and is therefore subject to the jurisdiction of this court pursuant to the Family and Medical Leave Act.

### IV.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

    6.    All conditions precedent to the institution of this suit have been fulfilled.  A charge of discrimination was timely filed with the EEOC and the Delaware Department of Labor.  The Delaware Department of Labor conducted an investigation into her claims and on October 30, 2006 it found reasonable cause to believe that Defendant had violated the law.  On November 8, 2007, a Notice of Right to Sue was issued by the U.S. Department of Justice.  That notice of right to sue was received by plaintiff on or about November 13, 2007.  This action is filed within ninety (90) days of receipt of said notice.

### V.  STATEMENT OF FACTS

    7.    Ms. Dixon was hired by the New Castle County Police Department in August of 1997 as an emergency call operator.

8. As an emergency call operator plaintiff typically worked 12 hour shifts for Defendant. She did this on a rotating shift which involved four consecutive days of work followed by four days off.

9. On August 26, 2005, plaintiff suffered a stroke. Ms. Dixon was admitted to St. Francis Hospital in Wilmington and was hospitalized for a period of 12 days. She was initially seen by Dr. N. Joseph Schrandt (a board certified neurologist) on August 28, 2005. She was released from the hospital on or about September 6, 2005. At that time she was not released to return to work by her treating physician.

10. At the time of her stroke Ms. Dixon had worked for Defendant for more than a year. Ms. Dixon's stroke was a serious medical condition. Because she suffered a serious medical condition Ms. Dixon's time away from work was covered under the FMLA.

11. At all times during the events in question Omega Medical Center/DOHR (hereinafter referred to as "Omega") acted as the final decision maker with regard to Defendant's employees who were returning to work after a period of disability. Pursuant to rules established by Defendant plaintiff was required to provide a return to work notice from her treating physician(s) to Omega before Omega would agree to set up an appointment for her to be seen by one of its physicians. Further, plaintiff was required to receive an approval from Omega before she would be allowed to return to work.

12. At the time of her stroke Ms. Dixon had suffered from insomnia for several years. As a result of the insomnia she had been prescribed medications by her physicians to help her sleep. Even with the prescribed medication Ms. Dixon often only sleeps three to four hours a night. Ms. Dixon's ideal amount of sleep is seven to eight hours per night.

13. On October 5, 2005, Ms. Dixon went to Omega with a note from Dr. Schrandt

which released her to return to work "without restrictions." Before she was allowed to return to work an appointment was scheduled for her to see Dr. Thomas, an employee of Omega.

14. On October 7, 2005, she gave Dr. Thomas of Omega the note from Dr. Schrandt. Even though he was not qualified to question Dr. Schrandt's treatment or evaluation of plaintiff Dr. Thomas questioned Dr. Schrandt's reference to her returning to work full time.

15. After a conference with Dr. Thomas, Dr. Schrandt changed his decision and allowed plaintiff to work on partial shifts (less than 12 hours). On October 10, 2005, William Streets, (hereinafter referred to as "Bill Streets") Defendant's Emergency Services Assistant Manager, advised Ms. Dixon that she was only permitted to work 6 hours shifts, and increasing 2 hours every 2 weeks pursuant to Dr. Thomas' instructions until reaching the her full 12 hour shift. Ms. Dixon was not aware of these restrictions until she spoke with Mr. Streets.

16. On October 16, 2005, Ms. Dixon requested to work a 40 hour work week. Ms. Dixon contemplated five days of work each week with each shift lasting eight hours. Ms. Dixon was advised by Dennis Quinn (Team Leader) and Bill Streets that a "40 hour work week" did not exist as per Mr. Streets' order. This was not true as Jeanette Stamm worked an eight hour day as an emergency call operator and had done so for several months. Because Mr. Streets would not allow plaintiff to work a 40 hour week after working 6 hours (as per doctor's orders), an additional 6 hours of sick time was charged to Ms. Dixon per shift.

17. On October 31, 2005, Ms. Dixon increased her hours by 2 hours (as per the doctor's orders) to 8 hours per day (while being charged an additional 4 hours of sick time). On November 8, 2005, her shifts were converted from typical 12 hour shifts to a 10 hour shift and her employer then charged her with 2 hours of sick time per shift. On November 11, 2005 plaintiff's sick and vacation time was all used up.

4

18. On November 16, 2005, (after all of her accrued sick and vacation time had been used), Ms. Dixon was converted to a 40 hour work week of 10 hours per day, 4 shifts per week. At that point Ms. Dixon was only paid for 10 hours of work a day.

19. On December 2, 2005, Ms. Dixon's 12 hour shifts resumed. Supervisor Cunningham advised Ms. Dixon she would need a medical release to resume full duty. Deputy Chief Streets spoke to New Castle County Risk Management and was orally advised that there were "no further restrictions" and plaintiff was released to full duty. Risk Management also advised there was no indication in Ms. Dixon's record for a need for another medical re-evaluation before returning to full duty.

20. On December 13, 2005, Mr. Quinn emailed plaintiff's Supervisor, Stephen Cunningham, advising him that Ms. Dixon needed to be re-evaluated by Omega in order to return to work full duty. Ms. Dixon advised Mr. Cunningham of an appointment scheduled on December 29, 2005, with her treating physician and that she would obtain a new release. Ms. Dixon worked her regular shift until her upcoming appointment.

21. On December 29, 2005, plaintiff received a note from Dr. Schrandt indicating "Ms. Dixon may work full time from a neurological point of view."

22. On January 3, 2006, Ms. Dixon returned to her workplace, providing Defendant with her doctor's note. Upon receiving the note, the secretary made an appointment for Ms. Dixon to go to Omega to be seen by one of its physicians on January 11, 2006.

23. Upon information and belief, on January 6, 2006, an employee of Defendant claimed to have heard Ms. Dixon say that she was suffering from a headache and dizziness. (Ms. Dixon did not actually complain to anyone at her workplace that she was suffering from such symptoms.) The as yet unidentified individual who claimed to have knowledge of the

plaintiff's purported complaints reported to a member of Defendant's management and thereupon to Risk Management. Without proper medical information to evaluate plaintiff's purported complaints Defendant was unreasonably concerned about plaintiff's health and took steps to prevent her from working due to its irrational fear of her hurting herself in the workplace.

24.     On January 11, 2006 plaintiff's re-evaluation was conducted. Dr. Thomas, upon information and belief a general practitioner with no experience treating persons who have suffered strokes, requested all of plaintiff's doctor's names and phone numbers. Ms. Dixon also provided her with the December 29, 2005 note from Dr. Schrandt. Dr. Thomas sent Ms. Dixon back to work without further information. Dr. Thomas followed up with an email to Risk Management stating that Ms. Dixon could *not* work a 12 hour shift with the intent that she would follow up at a later date. Chief Dave Roberts came to Ms. Dixon and told her that Risk Management had decided that Ms. Dixon could not work 12 hours. He also told her that pending further information from Risk Management he would delay making a schedule. Chief Roberts ordered Ms. Dixon to leave work at 3:00 p.m. Because Mr. Roberts could not tell her how long she was supposed to work, he agreed to let Ms. Dixon work the remainder of her shift.

25.     On January 12, 2006, while plaintiff was at her work station Chief Roberts approached and told her that she was no longer able to work at all due to Dr. Thomas' order. This conversation occurred on the open floor. Ms. Dixon's response was "Why? What happened?' Chief Roberts advised he received a note from Risk Management which stated that she could not work at all, at which time Roberts invited plaintiff to his office where he placed a call to Risk Management. Jenny Hinkle of Risk Management informed Chief Roberts that Ms. Dixon would need a note from ALL of the treating physicians stating that Ms. Dixon was able to

work. Ms. Dixon was promptly sent home.

26. On January 13, 2006, Ms. Dixon contacted all of her doctors and made appointments as soon as possible. Ms. Dixon notified the secretary Virginia Coughlin and Nancy Kelley of Risk Management, of her appointment dates.

27. On January 17, 2006, plaintiff saw Dr. Schrandt. Unbeknownst to her, Dr. Thomas had contacted Dr. Schrandt on January 13, 2006, without Ms. Dixon's knowledge or approval. In response to that conversation Dr. Schrandt wrote to Dr. Thomas outlining Ms. Dixon's medications, insomnia and sleep hygiene issues, etc. Dr. Schrandt also opined that her issues should not prohibit her from returning to work. Chief Roberts thereafter received an e-mail from Risk Management indicating plaintiff continued to be unable to return to work. This was contrary to Dr. Schrandt's opinion.

28. On January 19, 2006 Plaintiff contacted Dr. Thomas' office to see if she had received anything from Dr. Schrandt. At that time Ms. Dixon was informed by Mike Campbell that they (Dr. Thomas' office) had received Dr. Schrandt's note stating "Ms. Dixon could not return to work." That was a misrepresentation by Mr. Campbell.

29. On January 19, 2006, Ms. Dixon received a release from Dr. Balu (pain management) indicating she could return to work.

30. On January 20, 2006, plaintiff spoke with Dr. Schrandt's office and was informed that the note of January 17, 2006, was read incorrectly by Mr. Campbell. Ms. Dixon called Dr. Thomas' office again to clear up the situation. After speaking with Dr. Thomas, who was clearly frustrated, handing the phone back to Mike Campbell, Ms. Dixon was told that she needed a note from Dr. Schrandt indicating "no restrictions."

31. On January 26, 2006, after leaving messages with his office on January 23 and

7

January 25, Ms. Dixon went directly to Dr. Schrandt's office. Dr. Schrandt, feeling that he had not been provided all the facts by Omega, refused to indicate that there were "no restrictions." He did provide plaintiff with a return to work release. Plaintiff took the release to Omega. However, Dr. Thomas refused to allow her to return to work because the note did not contain the words "no restrictions."

32. On January 27, 2006, Ms. Dixon returned to Dr. Schrandt, and obtained another note indicating "Referring to my 1/26/06 note, I think that <u>intermittent</u> supervision during her first two shifts is all that is required." Plaintiff provided the note to Dr. Thomas. Dr. Thomas again refused to accept the note as written. Upon hearing of Omega's position Dr. Schrandt indicated this was the *last* note he would write on this matter. Plaintiff then called Nancy Kelley of Risk Management to see if she would provide an explanation as to why Ms. Dixon was being treated this way. Ms. Kelley refused to provide any explanation as to why Ms. Dixon was being held out of work and simply told her that she had to obtain a note that said "no restrictions."

33. On January 30, 2006, plaintiff gave copies of all notes of the previous week to the secretary Virginia Coughlin and subsequently met with Bill Streets, Dave Roberts and Dennis Quinn. Ms. Dixon inquired why she was denied the ability to return to work. They did not know the answer and therefore called Risk Management to speak with Mr. Kleckner, but he was not available. Ms. Dixon was told that she would be contacted when an answer had been provided by Risk Management. Ms. Dixon was never contacted.

34. On January 31, 2006, Ms. Dixon called Dave Roberts and the union president, Kenny Dunn, inquiring when she would be able to return to work. No answers were provided at that time.

35. On February 1, 2006, Ms. Dixon spoke to Mr. Dunn. Dunn claimed that he had

spoken to Brett Kleckner at Risk Management. Mr. Dunn said that Mr. Kleckner simply insisted on a note "without restrictions." Still no answers were provided as to why Ms. Dixon was taken out of work in the first place.

36.     On February 3, 2006, Ms. Dixon received a phone call from Kenny Dunn advising Ms. Dixon to obtain a note that indicates "no restrictions." Mr. Dunn spoke to Dave Roberts who indicated that Ms. Dixon was running out of vacation and sick time and if she did not receive a note, she would be terminated, upon all of her accrued paid time off being exhausted. Mr. Roberts then called Ms. Dixon relaying this information. Ms. Dixon contacted Dr. Schrandt's office again requesting another note but had to leave a message on his answering machine, requesting a note because her employer would terminate her if she did not produce a note indicating "no restrictions." Dr. Schrandt tried to contact Dr. Thomas via phone but was unsuccessful.

37.     On February 6, 2006, Dr. Schrandt spoke with Dr. Thomas regarding the note stating that Ms. Dixon will be ok to do her job. The note stated as follows: "Dr. Thomas will contact Risk Management to discuss. I told Dr. Thomas that I am almost certain she should be fine to do her job, but I am not 100% certain, thus the necessity of initial supervision. I told Dr. Thomas that the supervision requirements as outlined are <u>not</u> an unreasonable burden for the employer, so failure of the employer to comply is <u>unreasonable</u>."

38.     On February 7, 2006, plaintiff, unaware of Dr. Schrandt's call to Dr. Thomas on the 6th, called Dr. Schrandt's office again, requesting another note. On February 8, 2006, Dr. Schrandt spoke to Dr. Thomas regarding plaintiff's return to work. Dr. Thomas advised Dr. Schrandt that she would talk to Ms. Dixon's employer regarding her returning to work.

39.     On February 8, 2006, Ms. Dixon spoke with Brett Kleckner. He told her that she

9

needed to provide a note from any physician. On the 10th he sent Ms. Dixon an e-mail advising her that she had to produce a note from Dr. Schrandt indicating that Ms. Dixon was capable of full time, unrestricted duty without conditions.

40. On February 9, 2006, Ms. Dixon spoke to Dr. Schrandt and he relayed the conversation he had with Dr. Thomas on the 6th.

41. On February 13, 2006, Ms. Dixon sent an e-mail to Kenny Dunn setting forth the situation. She also spoke with him on the phone and told her that she would phone the Dept. of Labor regarding her situation.

42. On February 14, 2006, plaintiff saw her primary care physician in the hopes of obtaining the required note due to Mr. Kleckner's initial statement that he would take "a note from any doctor." Dr. James provided plaintiff with a note indicating that plaintiff "needs supervision <u>initially</u> upon returning to work. Neurologist feels that this is a reasonable request as do we. Besides this, there are no other restrictions." On February 17, 2006, Ms. Dixon was advised by Risk Management that she had to be examined by Omega Medical Center's neurologist, Dr. Katz. An appointment was scheduled for February 23, 2006.

43. On February 20, 2006, plaintiff provided a response to Brett Kleckner's e-mail requesting information. On February 23, 2006, Dr. Katz gave Ms. Dixon a clean bill of health and advised she could return to work on February 28.

44. On February 24, 2006, upon receipt of Dr. Katz' approval Dr. Thomas declared Ms. Dixon to be able to return to work full duty, without restrictions. Ms. Dixon returned to work that day. Upon information and belief, the reason Defendant took plaintiff out of work on January 12, 2006 and refused to allow her to return to work until February 24, 2006 is that it had an unfounded, unreasonable, and irrational fear that she would have another stroke and/or it was

unreasonably concerned about the medications plaintiff was taking for her insomnia and her stroke.

45. Based upon the work restrictions issued by Dr. Thomas (not allowing plaintiff to work with no reasonable explanation and in requiring a full duty/no restrictions release to return to work) Defendant erroneously regarded plaintiff as an individual with a significant impairment of a major life activity; "working". If Ms. Dixon was actually limited from working as contemplated by Defendant she would be significantly restricted in her ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. Ms. Dixon therefore has a disability as defined by the ADA and the DHPEPA.

46. Because of her sleep disturbance (insomnia) Ms. Dixon has a significant impairment of the major life activity of "sleeping". She therefore has a disability under the Americans with Disabilities Act and the Delaware Handicapped Persons in Employment Protection Act.

47. Because plaintiff previously worked successfully as an emergency call operator she was qualified to perform that position.

48. Ms. Dixon's request to be allowed to work a 40 hour work week prior to being release to full duty by her physician was a reasonable accommodation. Therefore she was a qualified individual with a disability under the ADA and the DHPEPA.

## COUNT I

## ADA VIOLATION

49. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 48 as though set forth fully herein.

50. The unlawful actions of defendant in refusing to afford plaintiff a reasonable accommodation which would allow her to return to work on a limited duty basis without using her sick time, because of her disability constitutes an intentional violation of the Americans with Disabilities act, Title 42 U.S.C. § 12101, et seq.

51. The unlawful action of defendant, in refusing to allow plaintiff to work at all from January 12, 2006 to February 24, 2006, by insisting on a "no restrictions" release from her physician is a per se intentional violation of the Americans with Disabilities act, Title 42 U.S.C. § 12101, et seq.

52. As a direct result of defendant's willful and unlawful actions in violation of the ADA, plaintiff has suffered emotional pain and distress, and has sustained a loss of earnings, plus the value of the aforementioned benefits, plus loss of earning power, plus loss of back pay and front pay and interest due thereon.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in her favor:

(a) Awarding lost wages, including lost fringe benefits;

(b) Awarding compensatory damages;

(c) Awarding the costs of this action, together with reasonable attorney's fees; and

(d) granting such other relief as the Court deems necessary and appropriate.

## COUNT II

## VIOLATION OF DELAWARE HANDICAPPED PERSONS IN EMPLOYMENT PROTECTION ACT

53. Plaintiff incorporates by reference the allegations of paragraphs 1 through 52 as though fully set forth herein.

54. The unlawful action of defendant in refusing to provide a reasonable accommodation to plaintiff, constituted a violation of plaintiff's rights as secured by the DHPEPA.

55. The unlawful action of defendant, in refusing to allow plaintiff to work at all from January 12, 2006 to February 24, 2006, by insisting on a "no restrictions" release from her physician is a per se intentional violation of the DHPEPA.

56. As a direct result of defendant's willful and unlawful actions in violation of the DHPEPA, plaintiff has suffered emotional pain and distress, humiliation, embarrassment, loss of self-esteem and has sustained a loss of earnings, plus the value of the aforementioned benefits, plus loss of earning power, plus loss of back pay and front pay and interest due thereon.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in her favor:

(a) Awarding lost wages, including lost fringe benefits;

(b) Awarding compensatory damages;

(c) Awarding the costs of this action, together with reasonable attorney's fees; and

(d) granting such other relief as the Court deems necessary and appropriate.

## COUNT V

### VIOLATION OF THE FMLA

57. Plaintiff incorporates by reference the allegations of paragraphs 1 through 56 as though fully set forth herein.

58. Plaintiff is a person with a serious health condition pursuant to the FMLA who worked in excess of 1250 hours during the calendar year preceding her leave on August 26, 2005. Defendant is a covered employer under the Act. By refusing to allow her to come back to

work according to her treating physician's instructions and by forcing her to use accrued sick and vacation leave and then when she had been released to full duty work in not allowing her to work at all from January 12, 2006 to February 24, 2006, the defendant interfered with her rights (retaliating against her) in violation of the FMLA.

59.     As a direct result of defendant's willful and unlawful actions in violation of the FMLA, plaintiff has sustained a loss of earnings, plus the value of the aforementioned benefits, plus loss of earning power, plus loss of back pay and front pay and interest due thereon.

60.     Defendant's actions were willful and wanton and exhibit malice and/or reckless indifference to plaintiff's federally protected civil rights under the Family and Medical Leave Act, and plaintiff is therefore entitled to receive liquidated damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in her favor:

(a)     Awarding her lost wages, including lost fringe benefits;

(b)     Awarding her compensatory damages;

(c)     Award her liquidated damages;

(d)     Awarding her the costs of this action, together with reasonable attorney's fees under 29 U.S.C. § 2601 et seq.; and

(e)     granting such other relief as the Court deems necessary and appropriate.

PLAINTIFF HEREBY DEMANDS A JURY TRIAL FOR ALL CLAIMS RAISED

Respectfully submitted,

By: /s/ Stephen J. Neuberger
Stephen J. Neuberger (#4440)
The Neuberger Firm
2 E. 7th Street, Suite 302
Wilmington., DE 19801

(302) 655-0582
(302) 655-9329 facsimile
sjn@neubergerlaw.com
Attorney for Plaintiff

Dated:  February 11, 2008

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
TONIA DIXON

## DEFENDANTS
NEW CASTLE COUNTY

(b) County of Residence of First Listed  NEW CASTLE
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
THE NEUBERGER FIRM, P.A.
TWO EAST SEVENTH STREET, SUITE 302
WILMINGTON, DE 19801
302-655-0582

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- X 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | 4 |
| Citizen of Another State | 2 | ☐ 2 | Incorporated and Principal of Business In Another State | ☐ 5 | ☐5 |
| Citizen or Subject of a Foreign Country | 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus: | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | X 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- X 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

This is an original action for deprivation of Plaintiff's civil rights under the ADA, 42 U.S.C. § 2000e et seq.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: X Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE _____
DOCKET NUMBER _____

DATE Feb 11, 2008

SIGNATURE OF ATTORNEY OF RECORD /s/ Stephen J. Neuberger

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. 08-85

# ACKNOWLEDGMENT OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A UNITED STATES MAGISTRATE JUDGE TO EXERCISE JURISDICTION*

FILED U.S. DISTRICT COURT DISTRICT OF DELAWARE 2008 FEB 11 AM 9:52

I HEREBY ACKNOWLEDGE RECEIPT OF _2_ COPIES OF AO FORM 85.

FEB 1 1 2008

(Date forms issued)

_____
(Signature of Party or their Representative)

Raeann Warner
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action